Robert A. Spalding and Viola C. Spalding v. Commissioner.
Spalding v. Commissioner
Docket No. 1234-65.
United States Tax Court
T.C. Memo 1966-226; 1966 Tax Ct. Memo LEXIS 59; 25 T.C.M. (CCH) 1171; T.C.M. (RIA) 66226; October 12, 1966
*59 Robert A. Spalding, pro se, 1796 O'Malley, Upland, Calif. Morley H. White, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: A deficiency in the income tax of petitioners has been determined by the Commissioner for the taxable year 1959 in the amount of $825.36. The issues presented by the pleadings are (1) the correctness of respondent's inclusion in petitioners' gross income of the amount of $3,640 paid petitioner Robert A. Spalding by his employer as per diem reimbursement for living expenses and (2) whether petitioner is entitled to a deduction for commuting expense from his place of residence to his place of employment. Findings of Fact The stipulated facts are found as stipulated. The petitioners are individuals with their residence at Upland, California. They filed a timely joint Federal income tax return for the taxable year 1959 with the district director at Baltimore, Maryland. Petitioner (hereinafter reference to petitioner is reference to Robert Spalding) was born on July 13, 1932, in Easthampton, New York. He attended high school in New York where he graduated on June 5, 1950; he then attended Long Island A. & *60 T. Institute in Farmingdale, New York. He spent 4 years in the United States Air Force, having entered the service on February 27, 1952. He was honorably discharged on February 26, 1956. After discharge from the Air Force, petitioner enrolled at Tri-State College, Angola, Indiana, for the spring semester starting March 17, 1956. He was graduated from Tri-State College and received a Bachelor of Science degree in Aeronautical Engineering on June 13, 1958. On his application for admission to Tri-State College, he stated his residence to be at 315 Park Avenue, Babylon, New York. In 1958, and during his senior year in college, petitioner attempted to procure employment through the use of Tri-State College's placement service office. In his application for placement, he listed his home address as 61 Andrew Avenue, Islip Terrace, New York. During his 2 years at Tri-State College he lived in rented rooms in Angola, Indiana. Petitioner was employed by Stratos, Division of Fairchild, as an engineering trainee from June 1, 1957 to September 1, 1957. His place of employment was Bay Shore, New York. Petitioner was employed on June 23, 1958, by McDonnell Aircraft Company (hereinafter McDonnell) *61 in St. Louis, Missouri; he went to St. Louis approximately 2 days after being graduated from Tri-State College, at which time he entered a 5 weeks' training program with McDonnell. While employed in St. Louis, petitioner lived in a rented apartment in St. Charles, Missouri, with two other roommates, all of whom shared the rent. He owned no real estate in St. Louis, and does not presently do so. He has never filed a Missouri State Income Tax Return. On September 29, 1958, petitioner was transferred by his employer from St. Louis to Holloman Air Force Base (hereinafter Holloman), Alamogordo, New Mexico, until February 28, 1959, a period of 5 months. His assignment at Holloman was extended on February 9, 1959, until November 29, 1959, a period of 9 months. On November 9, 1959, his assignment at Holloman was extended until August 29, 1960, a period of 9 months. On February 23, 1960, he returned to St. Louis and returned to Holloman on February 28, 1960. On March 1, 1960, he was assigned from Holloman to Lexington Park, Maryland. Petitioner married his present wife on February 14, 1959, in Alamogordo, New Mexico. Until his marriage on February 14, 1959, he lived in a rented apartment *62 in Alamogordo, New Mexico. After the marriage petitioners rented a furnished apartment for approximately 2 weeks, after which time they moved into a furnished house where they remained during their stay in New Mexico. Petitioner maintained a checking account and savings account in Alamogordo, New Mexico. He maintained no checking account in St. Louis, but maintained a small savings account in St. Charles, Missouri. While employed at Holloman petitioner received, in addition to his regular salary, a $10 per diem allowance for a total of $3,640, which amount petitioners did not include in their gross income for the taxable year 1959. McDonnell is engaged in the research, development, and production of airplanes, missiles, and spacecraft. Over 99 percent of its business is from defense work under Government contracts. McDonnell carries on its overall operations in an Engineering and Testing Division and in a Production Division. The Engineering and Testing Division designs, tests, and develops aircraft and missiles, while the Production Division manufactures these airborne weapons for the Government. McDonnell's Production Division carries on its manufacturing operations at *63 McDonnell's only permanent plant in St. Louis, Missouri. The Engineering and Testing Division conducts its research and designs and produces prototype aircraft and missiles at McDonnell's only permanent plant in St. Louis, Missouri. The Engineering Division then tests these articles at facilities provided by the Air Force and Navy in accordance with their contracts with McDonnell. McDonnell has conducted testing projects at Holloman, New Mexico; Edwards Air Force Base, California; Eglin Field, Florida; Patuxent River, Maryland; and Cape Canaveral, Florida. In October 1956, McDonnell entered into a contract with the United States Air Force whereby it became one of the participants in the research and development of an airplane known as the F-101. The F-101 program required each contractor to carry out certain parts of the testing at Holloman. During the years 1956 through 1960 McDonnell scheduled and carried out 10 separate testing programs on the F-101 under this contract and supplements thereto. Both the contract with respect to the F-101 and the GAM-72 provided for the Government to reimburse McDonnell for the cost of certain amounts it paid to employees for travel and per diem *64 living expenses. The contract provisions relative to the payment of these costs read in part as follows: General Provisions Clause 4: (a) For the performance of this contract the Government shall pay to the contractor the costs thereof determined by the Contracting Officer to be allowable in accordance with Part II of Section XV of the Armed Forces Procurement Regulations as in effect on the date of this contract and the schedule (hereinafter referred to as "allowable costs") plus such fixed fee, if any, as may be provided for in the schedule. * * *
Part VI Additional allowable costs Within the meaning of Clause 4 of the General Provisions of this contract the following costs are deemed allowable in the performance of this contract. * * *
4. Costs for travel and per diem in accordance with the contractor's control procedures accepted by the Administrative Contracting Officer. The schedule referred to in clause 4 of the General Provisions of the contract is a schedule of a specific job or item to be undertaken and sets forth the amounts to be paid therefor. The Armed Services Procurement Regulations in force at the time the contracts for the F-101 and GAM-72 *65 were entered into between the Government and McDonnell provided a general basis for the determination of the allowable direct costs including material, labor, and other direct costs, and allowable indirect costs and contained examples of items of allowable and unallowable costs. Included in the items set out as examples of items of allowable cost was an item entitled "travel expenses." McDonnell formulated control procedures on travel and relocation policy and on special field assignments which were submitted to the Air Force contracting officer for approval. In the event the contracting officer failed to approve a control procedure, McDonnell revised it to correct the matter to which the contracting officer objected. McDonnell's control procedure 20.100 which provided for travel and relocation policy was issued on January 1, 1955. This control procedure, as revised from time to time, was in force at McDonnell from the date of its issuance through the year 1960 and was accepted by the Air Force contracting officer as controlling McDonnell's expenses for costs of travel and per diem in connection with the F-101 and GAM-72 contracts. Control procedure 20.100 as issued January 1, 1955, provided *66 that authorizing personnel are responsible for the selection of the procedure under which an employee will be authorized to travel and that: B. REGULATIONS 1. Authorizing personnel will manually approve travel or relocation prior to departure of employee in accordance with the following: C.P.20.101 TRAVEL - Domestic: Trips of a temporary nature from employee's home base within the continental limits of the United States. C.P.20.102 TRAVEL - Foreign Assignment: Any trip outside the continental limits of the United States. C.P.20.103 TRAVEL - Special Field Assignment: Temporary relocation for assignments of a special nature. C.P.20.104 TRAVEL - Relocation: Permanent relocation of present MAC employees within continental limits of the United States. C.P.20.105 TRAVEL AND RELOCATION - Field Service Representatives. C.P.20.106 TRAVEL - Local. This provision remained unchanged in the various revisions of control procedure 20.100 throughout and including the revision of January 22, 1960. McDonnell's control procedure 20.103 which is entitled, "Travel - Special Field Assignment," was issued on January 1, 1955. This control procedure with various revisions was in force *67 at McDonnell from the date of its issuance until subsequent to June 1960 and was accepted by the Air Force contracting officer as controlling McDonnell's expenses for costs of travel and per diem in connection with the F-101 and GAM-72 contracts. McDonnell's policy and regulations with respect to the payment of per diem as set forth in control procedure 20.103, revised January 21, 1957, provided in part: A. POLLICY 1. Individual employees or groups of employees assigned to a single location for any period of 30 days to 9 months, will be subject to the regulations and provisions of this procedure, except when circumstances require special regulations, provisions or exceptions to this policy. * * *
C. REGULATIONS 1. No employee may be "assigned" to a single location for any period in excess of 9 months. a. Extension of "assignment" beyond 9 months will require review and additional approval of Vice President, Personnel or his designee. (1) No per diem is authorized in excess of 9 months without such approval. 2. No employee may be "assigned" more than once for the duration of a single project. 3. Employee "assigned" for 60 days or more may take dependents to point *68 of assignment subject to the following: a. Only one round trip for each dependent will be allowed during "assignment." 4. Vacations occurring during assignment * * *
c. No per diem will be paid during vacations, regardless of where vacation is spent. * * *
E. ALLOWABLE EXPENSES * * * 4. LIVING ALLOWANCES: A. @EMPLOYEE: $10 per day throughout assignment, except during vacations, beginning with day of departure from home, from which lodging must be provided. These provisions of control procedure 20.103 remained unchanged from January 21, 1957, throughout the various revisions through the revision of June 12, 1960. Control procedure 20.103 as revised May 7, 1956, contained the provisions as above quoted except that paragraph C3a thereof provided: a. If he elects to leave dependents at home, he will be authorized transportation expense at the end of every 5th week to and from home for a weekend visit with departure normally to be scheduled at the close of work on Friday, and in no event earlier than Friday noon. (1) Per diem will continue as authorized for the assignment and no additional per diem will be authorized during visit. (2) If before the end *69 of the 5th week the employee decides that he would like to have his dependents with him, he may request authority for dependents' travel. (a) Such authorization will require preparation and approval of a new TRAVEL AND RELOCATION AUTHORITY identical with and cross-referenced to the original TRAVEL AND RELOCATION AUTHORITY, and bearing number of dependents authorized and any travel advance required. Beginning in May 1956 and throughout the years here involved a large number of employees from McDonnell's plant in St. Louis worked at Holloman on the F-101 and GAM-72 projects. At one time over 300 such employees were working there. Substantially all of these employees were initially assigned for a period of 9 months. All employees who were assigned from St. Louis to work on the F-101 and GAM-72 projects at Holloman received a $10 per diem living allowance while they were at Holloman. The Air Force reimbursed McDonnell for these per diem living allowance payments in accordance with the provisions in the F-101 and GAM-72 contracts. Sometime early in 1958 McDonnell discontinued the use of the travel expense reports and instead each week prepared a list which contained the names of all *70 employees at Holloman during the particular week and the amount of per diem due to each. In order to receive his per diem living allowance petitioner was required to sign this list opposite his name. No restrictions were placed upon McDonnell or petitioner as to how the amounts received as per diem payments would be used. Petitioner was assigned to Holloman as a data analyst. Petitioner was familiar with procedure 20.103. He had no objection to being continued on the job at Holloman. Petitioner did not vote in any state primary or general elections until his arrival in California some years after the taxable year involved in the instant case. Petitioner has not substantiated any of the expenses incurred by him in commuting to and from his place of employment in both St. Louis and Alamogordo. Opinion This case is so nearly on all fours factually with , affd. (C.A. 8), as to be controlled by it on the first issue. We therefore hold that $3,640 paid petitioner Robert A. Spalding by McDonnell, his employer, as per diem reimbursement for his living expense during 1959 is properly to be included in his gross *71 income for that year. Inasmuch as petitioners have offered no evidence whatsoever with respect to the second issue, we assume they have abandoned it. Decision will be entered for the respondent.